### b. AMD Application Note

Cisco says that the AMD Application Note was published in June 1991. The document itself has an issue date of June 1991 and "Publication #15293" on its cover. Eugen Gershon, the author of the AMD Application Note, said (emphasis added):

> It is my understanding that, once approved by AMD, I would be free to discuss the AMD Application Note and its contents with AMD's customers. The **Application Note was given to both customers of AMD and FAE's (Field Application Engineers)** around the world whose job it was to assist customers to address technical issues. It is my understanding we could discuss the Application Note and the information therein without restriction, and that it was **made available to any customer who requested a copy or expressed interest in FDDI chipsets**. Even today, the AMD Application Note is still made available by AMD free of charge to anyone who desires a copy.

The primary purpose of AMD application notes was to assist customers with new technology. Basil Alwan and Robert O'Hara, other AMD employees, said that it was AMD's regular business practice to publicly distribute such application notes as early as possible before the new applications came out. They also confirmed that copies were actually provided to AMD's customers, sales force, and FAEs. Alwan prepared a cover sheet and packet for use in responding to requests for information on FDDI-over-STP technology, which attached both the Green Book and the AMD Application Note. O'Hara said that multiple copies of application notes were distributed to AMD field offices once a month so that customers could obtain copies by calling the AMD field offices. "Evidence of routine business practice can be sufficient to prove that a reference was made accessible before a critical date." Constant, 848 F.2d at 1569. Here, AMD's general policy was to use application notes as promotional tools. It sought to disseminate them as widely as possible to generate sales. The AMD Application

Note was actually sent to customers, sales force, and FAEs.

Chrimar says that because the AMD Application Note, like the Green Book, was created and stored privately as opposed to being housed in a public library, interested persons would not have any reason to believe that it existed. However, AMD published multiple application notes and made them all publicly available and indexed for retrieval. Although the AMD Application Note did not receive the level of media coverage given to the Green Book, evidence of actual dissemination more than makes up for the lack of publicity. An interested person of ordinary skill in the art could locate the AMD Application Note with reasonable effort.

As a matter of law, the AMD Application Note is a "printed publication" under 35 U.S.C. §§ 102(a) and 102(b).

### 3. § 102(a): Prior Use or Knowledge

Cisco says that claim 1 of the '260 patent is anticipated because "the invention was known or used . . . by others in this country . . . before the invention thereof by the applicant for patent." 35 U.S.C. § 102(a). "[I]n order to invalidate a patent based on prior knowledge or use, that knowledge or use must have been available to the public." Woodland Trust v. Flowertree Nursery, 148 F.3d 1368, 1370 (Fed. Cir. 1998); Carella v. Starlight Archery & Pro Line Co., 804 F.2d 135, 139 (Fed. Cir. 1986).

Regarding the use component of 35 U.S.C. § 102(a), Cisco says that the May 21, 1991 demonstration constituted prior use available to the public. First, numerous witnesses said that the demonstration was public. For instance, Michael Howard said that "the public demonstration was well attended by interested engineers, company representatives, and members of the press." While Chrimar again argues that no

engineers from outside the "Authoring Group" were present, it is clear that the demonstrators did not specifically limit attendance to members of the five companies. Further, the demonstration and announcement were advertised in the May 20, 1991 issue of Communications Week.

>Next, Chrimar admits the following (emphasis added):
>
>At the May 21, 1991 technology demonstration, DEC, Chipcom and SynOptics each provided concentrators, and all five companies provided computer workstations. As demonstrated on May 21, 1991, **each concentrator used multiple DC current loops originating at the M-ports of concentrators and extending over copper wires to the associated S-ports of individual computers which implemented the cable detect function of Green Book**. There, each concentrator used was connected to multiple computers forming a LAN.

Thus, Chrimar admits that the demonstration "implemented" the Green Book's "cable detect" circuit, which itself anticipates claim 1. See supra Part IV.C.1. Chrimar says that the invention was not "used" on May 21, 1991, though, because there is no evidence that a computer was actually physically disconnected from a concentrator. However, prior use under 35 U.S.C. § 102(a) only requires that all of the **elements** of the claimed invention be used by others in a manner accessible to the public. See Lockwood v. American Airlines, Inc., 107 F.3d 1565, 1570 (Fed. Cir. 1997) (holding that "public use of the high-level aspects" of a computer system was "enough to place the claimed features of the . . . patent in the public's possession" even though its particular software algorithms were confidential). Numerous witnesses confirmed that the demonstration worked to implement the solution set forth in the Green Book, including the "cable detect" circuit. Hence, the May 21, 1991 demonstration constituted public use of a circuit with "one or more electronic components capable of providing an

indication of a change in current flow which represents disconnection of a piece of electronic equipment from the network."

Regarding the knowledge component of 35 U.S.C. § 102(a), because the Green Book and the AMD Application Note were publicly accessible as "printed publications," see supra Part IV.C.2, they were also sufficiently available as public knowledge. The May 21, 1991 demonstration also shows the state of public knowledge at the time. See Ecolochem, Inc. v. Southern Cal. Edison Co., 227 F.3d 1361, 1369 (Fed. Cir. 2000) ("A presentation indicative of the state of knowledge and use in this country . . . qualifies as prior art for anticipation purposes under § 102[(a)].").

Public use and knowledge under 35 U.S.C. § 102(a) constitute additional grounds for invalidating claim 1 of the '260 patent.

### 4. § 102(g)(2): Prior Invention

Cisco says that claim 1 of the '260 patent was anticipated because "the invention was made in this country [before the date of invention] by another inventor who had not abandoned, suppressed, or concealed it." 35 U.S.C. § 102(g)(2). "Although § 102(g) is normally an issue when the PTO determines priority in an interference proceeding, an alleged infringer may use § 102(g) as a defense in an infringement action where the earlier inventor never filed a patent application." Oak Indus., Inc. v. Zenith Elecs. Corp., 726 F. Supp. 1525, 1533 (N.D. Ill. 1989). "To qualify as prior art under § 102(g), a prior invention must be conceived and reduced to practice. Furthermore, the prior inventor must not have abandoned, suppressed or concealed the invention." Id.; see Life Techs., Inc. v. Clontech Labs., Inc., 224 F.3d 1320, 1327 (Fed. Cir. 2000).

Cisco points to the May 21, 1991 demonstration, as well as evidence that SynOptics introduced a host module and concentrator that implemented the Green Book's "cable detect" circuit, to show that the invention was made prior to November 1991. However, prior invention under 35 U.S.C. § 102(g) has an additional requirement not found in 35 U.S.C. § 102(a)–the invention must have been made by another "inventor." See Dow Chem. Co. v. Astro-Valcour, Inc., 267 F.3d 1334, 1340 (Fed. Cir. 2001) ("it must be shown that an 'inventor' made the claimed invention to establish a first-inventor defense under § 102(g)"); Apotex USA, Inc. v. Merck & Co., 254 F.3d 1031, 1035 (Fed. Cir. 2001) ("Section 102(g) operates to ensure that a patent is awarded only to the 'first' inventor in law."). Cisco has not offered clear and convincing evidence to prove exactly who independently conceived the invention and reduced it to practice. Indeed, the witness declarations suggest that the Green Book was a collaborative effort involving five companies who each manufactured their own networking products based on the Green Book design. Hence, while Cisco has established that the invention was known or used by someone before November 1991, its proofs do not demonstrate what "inventor" made the invention prior to that date.

In any case, however, Cisco has already established anticipation of claim 1 of the '260 patent under 35 U.S.C. §§ 102(a) and 102(b).

### 5. Summary

Cisco's uncontroverted declarations from disinterested third-parties, along with corroborating exhibits, amount to clear and convincing evidence that claim 1 of the '260 patent is invalid under 35 U.S.C. §§ 102(a) and 102(b). No reasonable jury could find otherwise. Because the record does not reveal any genuine dispute of material fact,

summary judgment on Cisco's defense of invalidity is appropriate.

## V. Infringement

Chrimar and Cisco submitted cross motions for summary judgment on the issue of infringement. Once the claims of a patent are construed as a matter of law, "the properly construed claims [must be] compared to the allegedly infringing device to determine, as a matter of fact, whether all of the limitations of at least one claim are present, either literally or by a substantial equivalent, in the accused device." Teleflex, 299 F.3d at 1323. Here, the infringement determination is particularly amenable to summary judgment because, like in many cases, "the composition of the allegedly infringing process or product is undisputed." See Desper Prods., Inc. v. Qsound Labs, Inc., 157 F.3d 1325, 1332-33 (Fed. Cir. 1998). Summary judgment must be granted if there is no genuine issue as to any material fact. Id. at 1332.

Even if claim 1 of the '260 patent was not invalid under 35 U.S.C. §§ 102(a) and 102(b), Cisco would be entitled to summary judgment of noninfringement. See Stratoflex, Inc. v. Aeroquip Corp., 713 F.2d 1530, 1540-41 ("When presented with patent validity and infringement issues, trial courts should . . . decide both.").

### A. Literal Infringement

To literally infringe claim 1 of the '260 patent, the Cisco devices must literally embody "current loop means," "source means," and "detector means" as those terms have been interpreted.

#### 1. Current Loop Means

Claim 1 requires "current loop means," which has been interpreted as "multiple

current loops with each loop associated with a corresponding piece of electrical equipment. Each of the current loops is a pair of data communication lines that connect the corresponding piece of electronic equipment to a network through existing internal circuitry."

Chrimar says that the arrangement of either an Inline Power Switch or a Power Patch Panel with an IP Phone embodies "current loop means" because a current loop is formed from the DC power source to the IP Phone and back.

Cisco makes two arguments in response. First, Cisco says that the two arrangements lack the connection to "existing internal circuitry" that is required by claim 1. Cisco says that the IP Phone has special components that allow it to be detected as an inline power device and receive a high DC current, including relays, a low pass filter, and center-tapped transformers in a phantom current loop configuration. As support, Cisco points to the Court's earlier statement that "[i]t would appear that a device which was specially designed or modified so that it was compatible with the other devices on the network might not meet this limitation."[26]

"Existing internal circuitry" has been interpreted to mean "circuitry present in the monitored piece of electronic equipment at the time the end user acquires it." Cisco's expert, Dr. Paul Horowitz, admitted that the specialized internal circuitry in the IP Phone comes with the product when someone buys it. The purchaser does not need to purchase additional circuitry to specially design or modify the IP Phone and make it compatible with other devices on the network. Thus, the Inline Power Switch and

---

[26]See Memorandum and Order on Claim Construction (August 8, 2002), at 13 n.2.

Power Patch Panel connect to "existing internal circuitry" in the IP Phone.

Second, Cisco says that the Power Patch Panel does not have a current loop employing "a pair of data communication lines" connecting the electronic equipment to the network. According to Cisco, the Power Patch Panel segregates power distribution and data communication onto physically separate wires. Data communication occurs over wires 1, 2, 3, and 6, while inline power is delivered over "spare" wires 4, 5, 7, and 8. No data is transmitted over the "spare" wires while inline power is being supplied to the IP Phone. Further, claim 1 was expressly limited during prosecution to "data" communication lines, not just any communication lines. Therefore, Cisco says that a communication line must actually carry data, not merely be capable of carrying data, to infringe claim 1. Chrimar, however, argues that all eight wires are contained in the same physical cable, the IEEE 802.3 specification does not indicate that some of the wires are for data communication and some are for power distribution, and current delivered over the "spare" wires might interfere with data communication over the other wires.[27]

It is undisputed that no data packets are ever **actually** transmitted over the wires creating the current loop between the Power Patch Panel and the IP Phone while inline power is being supplied. In light of the amendment made during prosecution to specifically disclaim non-data communication lines and the fact that low DC current is

---

[27]Chrimar also points to an unauthenticated e-mail apparently from a Cisco employee that it first submitted at the hearing conducted by the Special Master. The e-mail ambiguously states that "there really aren't any 'unused pairs' as far as the 802.3 is concerned" and is not probative of whether the wires in the Power Patch Panel arrangement are "data communication lines."

specifically used to avoid interference with normal data communication, there is simply no question that only a device with a current loop of communication lines carrying data can infringe claim 1. Indeed, the error in Chrimar's reasoning is indicated in Cisco's statement that "according to Chrimar, any line which is physically associated with a data communication line infectiously becomes a data communication line, even though such line has nothing whatsoever to do with carrying data." Because the current loop wires in the Power Patch Panel do not communicate data, they cannot be considered "data communication lines." See Telemac, 247 F.3d at 1330 ("that a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement").

While the Inline Power Switch arrangement embodies "current loop means," the Power Patch Panel arrangement does not. Therefore, the Power Patch Panel does not literally infringe claim 1 of the '260 patent.

### 2. Source Means

Claim 1 requires "source means." This is a means-plus-function limitation under 35 U.S.C. § 112, ¶ 6. It has been interpreted to mean "a source that is capable of generating low DC current in the multiple current loops" with input terminal 25 and power supply 26 as the corresponding structure from the '260 patent specification. A "low DC current" is "sufficiently low so that it does not interfere with or adversely affect the operation of the associated electronic equipment or computer network."

Chrimar says that the "source means" in the Inline Power Switch and Power Patch Panel is the 48 volt DC power source, which generates a DC current over the current loops. Chrimar says that the 48 volt DC power source performs the identical

55

function as the '260 patent and has structure that is equivalent to input terminal 25 and power supply 26.

Cisco says that its devices do not have "source means" because "low DC current" is not generated in the current loops. According to Cisco, the IP Phones use 100 milliamps of current when in an idle state[28] and 180 milliamps during operation, while the preferred embodiment of the '260 patent utilizes "a low current preferably on the order of magnitude of less than one milliamp (1 mA) and, more specifically includes a preferred current of approximately fifty microamps (50 µA)." '260 patent, col. 3, ll. 56-60.

According to the Court's construction of "low DC current signal," the DC current must not "interfere with or adversely affect the operation of the associated electronic equipment [IP Phones] **or computer network**." Cisco says that its devices do not meet this limitation because damage to non-inline power devices on the network is not prevented by applying a "low" current level; rather, damage is prevented by not providing current at all. This is necessary because the DC current from the 48 volt DC power source would damage conventional network equipment (non-inline power devices) if Cisco did not use the "phone discovery algorithm" to distinguish between devices. Cisco's argument, however, refers to a hypothetical network, not the actual operation of its devices. In actual operation, the IP Phones, data communication lines, and other network devices are not interfered with or adversely affected by the DC current. Claim 1 does not state that DC current must be impressed on every data

---

[28]Chrimar's expert, Dr. Zhao, measured 60 milliamps when idle.

communication line going to every piece of equipment (regardless of whether it is inline power or non-inline power) connected to the network. It only requires DC current applied to multiple current loops without interfering with or adversely affecting network operation. The "low DC current signal" limitation is therefore met by the Cisco devices.

### 3. Detector Means

"Detector means" is a means-plus-function limitation. The function is "monitoring the current signal through each of said current loops and detecting a change in said current signal through one of said current loops which represents disconnection of said associated piece of equipment from the network." Monitoring and detecting is accomplished when the components are "capable of providing an indication of a change in current flow which represents disconnection of a piece of electronic equipment from the network. The indication need not be human-perceptible." The corresponding structure in the '260 patent specification is resistor $R_2$.

"[I]n order to establish literal infringement of a means-plus-function claim, the patentee must establish that the accused device employs structure identical or equivalent to the structure disclosed in the patent and that the accused device performs the identical function specified in the claim." WMD Gaming Inc. v. Int'l Game Tech., 184 F.3d 1339, 1350 (Fed. Cir. 1999). "The proper test for determining whether the structure in an accused device is equivalent to the structure recited in a section 112, ¶ 6, claim is whether the differences between the structure in the accused device and any disclosed in the specification are insubstantial." Id. at 1351; see also Kemco Sales, Inc. v. Control Papers Co., 208 F.3d 1352, 1364 (Fed. Cir. 2000) ("two structures may be 'equivalent' for purposes of 35 U.S.C. section 112, paragraph 6 if they perform the

57

identical function, in substantially the same way, with substantially the same result").

Thus, to literally infringe claim 1, the Cisco devices must monitor the current signal through the loops and detect a change in the current signal which represents disconnection of a piece of electronic equipment from the network. Next, the Cisco devices must have structure that is identical or equivalent to resistor $R_2$ to literally infringe claim 1.

The Cisco devices do not contain a resistor identical to resistor $R_2$. Chrimar, however, says that three parts are equivalent to resistor $R_2$: (1) the relays, (2) the Link Generator in the IP Phone, and (3) the PTC thermistor.

### a. IP Phone Relays

The relays in the IP Phone are comprised of flux-generating coils, switch contacts that move in response to that flux, and electrical contacts. The switch contacts move from the "off" position to the "on" position when DC current is applied and back to the "off" position when current is removed.

Cisco says that the relays cannot perform the function of "monitoring the current signal through **each of said current loops**" because they are located in the monitored equipment itself. According to Cisco, the functions in claim 1 can only be accomplished when the "detector means" is located in one physical place, which can then monitor current through each of the current loops.

Cisco is correct. A "detector means" that is placed in each piece of monitored equipment (IP Phone) cannot monitor current through each of the current loops for two reasons. First, the IP Phone only has access to the current flowing through its own

current loop not any other. Second, once the current loop to the equipment is broken, no "indication" can be provided because the IP Phone's physical connection is broken. Indeed, that is why the Inline Power Switch opens the control switch and turns off power in response to the absence of data pulses and link integrity pulses. Like the "source means" DC power source, which Chrimar concedes cannot be located in the monitored equipment, the IP Phone relays cannot perform the functions of claim 1 if they are found in the monitored equipment whose disconnection is being detected.

Chrimar responds that there is no explicit language in claim 1 limiting the "detector means" to a particular physical location. However, to infringe claim 1, an accused device must perform the identical monitoring and detecting functions of claim 1. Unlike the resistors $R_2$ in the '260 patent, the IP Phone relays cannot collectively perform the function of "monitoring the current signal through each of said current loops" if they are distributed throughout individual monitored devices.

Even if the IP Phone relays performed the same functions as the "detector means" in the '260 patent, they do not operate in substantially the same way to achieve substantially the same result as resistor $R_2$.

The '260 patent clearly states the "way" in which resistor $R_2$ provides an indication of a change in current flow as well as the indication "result"–resistor $R_2$ passively produces a voltage that is proportional to the current running through it. The voltage signal is then available for use by downstream circuitry that is not part of the "detector means." The IP Phone relays operate much differently. When DC current goes into the relay, a magnetic field is created, causing the switch contacts to mechanically move from the "off" position to the "on" position. When DC current stops

flowing and the magnetic field goes away, the switch contacts move back to the "off" position.

Chrimar argues for a broad range of equivalent structures saying that any component that produces a "binary" signal in response to the presence or absence of current flow operates equivalently. However, every electrical component that is "on" when power is connected and "off" when power is disconnected is not necessarily equivalent to the structure in the '260 patent. Rather, the component must function in substantially the same way to achieve substantially the same result **as resistor $R_2$** considering the invention as a whole. See Utah Med. Prods., Inc. v. Graphic Controls Corp., 350 F.3d 1376, 1384 (Fed. Cir. 2003) ("the equivalents analysis under section 112, paragraph 6, proceeds with reference to the context of the invention and the relevant field of art"); IMS Tech., Inc. v. Haas Automation, Inc., 206 F.3d 1422, 1436 (Fed. Cir. 2000) ("the context of the invention should be considered when performing a § 112, ¶ 6 equivalence analysis just as it is in a doctrine of equivalents determination"). Resistor $R_2$ passively produces a voltage signal that is proportional to the current flow, while the IP Phone relays actively change their physical state when current flows through the coils. The IP Phone relays operate in a substantially different way and produce a substantially different signal result.

Chrimar further cites the opinion of Dr. Zhao that a generic relay could be substituted for resistor $R_2$ in the preferred embodiment of the '260 patent and the system would still function properly. Chrimar also demonstrated at the hearing that resistor $R_2$ could be substituted with a generic relay and the circuit would still detect disconnection. However, "two structures that are equivalent in one environment may

not be equivalent in another." See IMS, 206 F.3d at 1436. As previously stated, the functioning of the "detector means" in the context of the '260 patent invention depends on its physical location in the system. The mere fact that the IP Phone relays might be configured to be a "detector means" in the right circuit environment, when in fact they are not configured in that manner in the accused device, does not support a finding that they are "detector means." See Telemac, 247 F.3d at 1330. Moreover, equivalence is not demonstrated by interchangeability alone when the accused components "function in accordance with markedly different principles, have greatly different capabilities, and generally do not operate in substantially the same way." See Wang Labs., Inc. v. America Online, Inc., 197 F.3d 1377, 1385 (Fed. Cir. 1999); Chiuminatta Concrete Concepts, Inc. v. Cardinal Indus., Inc., 145 F.3d 1303, 1309-10 (Fed. Cir. 1998).

In light of the substantial differences in operation and physical structure between resistor $R_2$ and the IP Phone relays, as well as their different physical locations and the fact that the IP Phone relays do not participate in a detection scheme at all, the IP Phone relays cannot be considered equivalent structure.

### b. Link Generator

The Link Generator in the IP Phone is used to transmit link integrity pulses to the Inline Power Switch when DC current is being supplied. When the IP Phone is physically disconnected, there is no power for the Link Generator to operate so no link integrity pulses can be sent.

Like the IP Phone relays, the Link Generator in the IP Phone does not perform the same function as the "detector means" in the '260 patent because it is located in the monitored device itself and is only aware of the DC current through the current loop

connecting that particular IP Phone to the Inline Power Switch. Indeed, Chrimar admits that when the IP Phone is disconnected, the break in the connection ensures that the Inline Power Switch cannot receive any pulses from the IP Phone anymore.

The Link Generator also does not constitute equivalent structure. It is comprised of tens of thousands of transistors organized as a complex state machine, while resistor $R_2$ is a simple device that passively provides a voltage drop as a result of current passing through it by virtue of the physical characteristics of its composite material. While resistor $R_2$ produces a voltage signal "indication," the Link Generator produces sequences of digital messages encoded as link integrity pulses. Chrimar says that the link integrity pulses stop and start in one-to-one correspondence with the DC current and thus act as a "proxy" for the DC current. However, the link integrity pulses are fundamentally different from resistor $R_2$'s voltage drop in proportion to current. Further, the link integrity pulses also cease during normal data communications (talking on the phone) and therefore cannot be considered a "proxy" for just the DC current. Because there are substantial differences between the Link Generator in the IP Phone and resistor $R_2$, the Link Generator is not equivalent structure.

### c. PTC Thermistor

Finally, although the PTC thermistor is located in the Inline Power Switch not the IP Phone, its structure and operation are strikingly different from resistor $R_2$. Chrimar admits that the PTC thermistor is a fuse designed to cut off power in the event of a short circuit or any other fault in the Inline Power Switch, the line, or the IP Phone that causes an over-current condition. It automatically resets when the current returns to normal. The fuse-like response arises directly from the physical properties of the

materials used to construct the PTC thermistor. Specifically, it is designed to have relatively low resistance so as to have no discernable effect on the power supplied to the circuit as long as the current remains at a safe level and extremely high resistance when the current is excessive. Thus, the resistance of the PTC thermistor changes. By contrast, the resistance of resistor $R_2$ is a constant value set to ensure a "low DC current signal" in the current loop. Cisco's expert, Rich Seifert, says that the components are therefore not interchangeable because if the resistance of resistor $R_2$ changed over time, it would not be possible to determine whether a change in current was due to the disconnection of a piece of equipment or due to a change in resistance.

Even if a PTC thermistor and resistor $R_2$ could be considered equivalent technologies as a general matter, they are not equivalent structures in the circumstances of this case. The Special Master correctly found:

> Since this particular resistor has nothing to do with detection, there is no sense in which it can be called a "detector means" or any part thereof. The one-to-one correspondence pointed out by Chrimar between disconnection and a drop in the PTC resistor current is merely something that happens, but not something that is used for detection purposes, and certainly not something that operates like $R_2$ in the patent.

Comparing the PTC thermistor and resistor $R_2$ in the context of the claimed invention as a whole, the PTC thermistor cannot be said to be monitoring the current signal in the current loop or detecting a change in the current signal representing disconnection; no indication is ever produced. While claim 1 does not require that any component take action based on the indication provided by the "detector means," the structure corresponding to the "detector means" must at least be involved in the monitoring and detecting functions. Like the IP Phone relays and the Link Generator in the IP Phone,

63

the PTC thermistor is not involved in a detection scheme at all. A "detector means" is something capable of providing an indication of a change in current representing disconnection; it does not, as Chrimar suggests, include every wire or part that has resistance and can produce a measurable voltage drop.

Further, the Cisco devices detect disconnection of an IP Phone by the absence of data pulses and link integrity pulses, not by a change in current flow using a resistor. The fact that Cisco performs the general detection function in a completely different way (which was known in the prior art) is itself a substantial difference. A PTC thermistor controlling power distribution and not detecting changes in current flow is not substantially similar to resistor $R_2$ detecting current flow, and no reasonable jury could so find.

The Cisco devices do not perform the same function or contain any structure that is equivalent to the "detector means" set forth in the '260 patent.

### 4. Summary

"The absence of even a single limitation of [the claim] from the accused device precludes a finding of literal infringement." Kahn v. General Motors Corp., 135 F.3d 1472, 1477 (Fed. Cir. 1998). The "detector means" limitation of claim 1 is not met by the Cisco devices. Additionally, the Power Patch Panels do not meet the "data communication lines" limitation. There are no genuine issues that require resolution by a trier of fact. Therefore, Cisco has not literally infringed claim 1 of the '260 patent.

### B. Infringement by Equivalents

Cisco moves for summary judgment of noninfringement based on the doctrine of

64

equivalents.[29] Chrimar's only response is to cite the statements of its expert, Dr. Zhao, that if the Cisco devices do not infringe literally, they at least infringe equivalently. However, "[a] party may not overcome a grant of summary judgment by merely offering conclusory statements." Moore U.S.A., Inc. v. Standard Register Co., 229 F.3d 1091, 1112 (Fed. Cir. 2000). "The mere recital of the Graver Tank mantra that the accused device performs 'the same function, in the same way, to achieve the same result,' without more, does not create a genuine issue of material fact as to whether an accused device infringes by equivalents." Id. at 1113.

Moreover, it is clear that the limitations of claim 1 that are not present in the Cisco devices literally are also not present equivalently. First, the Power Patch Panels do not meet the "data communication lines" limitation under the doctrine of equivalents. Claim 1 requires a current loop over a pair of data communication lines. The Power Patch Panel arrangement employs a current loop over wires that do not communicate data. This clearly does not amount to performing substantially the same function in substantially the same way to achieve substantially the same result.

Likewise, the Cisco devices do not meet the "detector means" limitation under the doctrine of equivalents because even if they performed an identical or equivalent function, they do not have structure that is equivalent to resistor $R_2$. See supra Part V.A.3; Kemco Sales, 208 F.3d at 1364 ("A key feature that distinguishes 'equivalents' under 35 U.S.C. section 112, paragraph 6 and 'equivalents' under the doctrine of equivalents is that 35 U.S.C. section 112, paragraph 6 equivalents must perform the

---

[29]Chrimar's motion for summary judgment of infringement does not address the doctrine of equivalents.

65

identical function of the disclosed structure, while equivalents under the doctrine of equivalents need only perform a substantially similar function. . . . Because the 'way' and 'result' prongs are the same under both the 35 U.S.C. section 112, paragraph 6 and doctrine of equivalents tests, a structure failing the 35 U.S.C. section 112, paragraph 6 test under either or both prongs must fail the doctrine of equivalents test for the same reason(s)."); Al-Site Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1321 (Fed. Cir. 1999).

There are no genuine issues of material fact as to whether the Cisco devices infringe under the doctrine of equivalents.

## VI. Conclusion

Cisco has presented clear and convincing evidence that claim 1 of the '260 patent is invalid under 35 U.S.C. §§ 102(a) and 102(b). Even if claim 1 was not invalid, the Cisco devices would not infringe claim 1 literally or equivalently. As there are no genuine issues as to any material fact, Cisco is entitled to summary judgment.

SO ORDERED.

Dated: MAY 13 2004
Detroit, Michigan

AVERN COHN
UNITED STATES DISTRICT JUDGE